UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,      )
                               )
                 Plaintiff,    )
                               )
          v.                   )      No. 3:07-CR-44
                               )      (Phillips / Shirley)
LUIS ERASMO ROSALES-RAMIREZ,   )
                               )
                 Defendant.    )


## REPORT AND RECOMMENDATION

All pre-trial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the district court as may be appropriate. This matter is before the Court upon Defendant Luis Erasmo Rosales-Ramirez's ("Defendant Ramirez") Motion to Suppress Evidence Seized from 5331 W. Fireopal Way ("Fireopal residence"), Tucson, Arizona and 4872 W. Placita De Los Vientos ("Placita De Los Vientos residence"), Tucson, Arizona [Doc. 97]. Defendant moves to suppress all evidence seized on or about May 16, 2007, claiming that the warrants for the properties were issued without probable cause. All of Defendant Ramirez's other non-dispositive pending motions are addressed by this Court's separately filed Memorandum and Order.

This Court held an Motion Hearing in this case on October 15, 2007. The government was represented by Assistant United States Attorney Hugh Ward ("AUSA Ward"). Attorney Joseph Saint-Veltri ("Attorney Saint-Veltri") represented Defendant Ramirez, who was also present. At the October 15 hearing, Attorney Saint-Veltri advised the Court that the defense

1

would not be presenting any testimony and would rely on the Motion to Suppress [Doc. 97] and Memorandum in Support [Doc. 97-2] filed on September 13, 2007. The government did not call any witnesses. As pre-trial motions were supplemented during the proceedings, the parties did not request leave to file post-hearing briefs. Accordingly, the Court took these matters under advisement on October 16, 2007.

## I. SEARCH WARRANT

On May 11, 2007 Special Agent Brian Grove ("SA Grove"), Internal Revenue Service, Criminal Investigation Division (IRS-CID), presented five applications for federal search warrants, based on eighteen-page affidavits [Docs. 97-3 and 97-4],[1] to a United States Magistrate Judge in the United States District Court, District of Arizona for the search of 5331 W. Fireopal Way, Tucson, Arizona and 4872 W. Placita De Los Vientos, Tucson, Arizona. The affidavit states that for the past sixteen (16) years, SA Grove has been investigating possible criminal violations of the Internal Revenue Laws (26 U.S.C. §7201 et. seq.), the Foreign Bank Secrecy Act (31 U.S.C. § 5324, et. seq.), the Money Laundering Control Act (18 U.S.C. § § 1956 and 1957), asset forfeiture (18 U.S.C. § § 981, 982, and 984) as well as drug related offenses pursuant to 21 U.S.C. § § 841 et. seq., as they relate to money laundering offenses. The affidavits reflect that SA Grove was participating in an investigation for the "laundering of proceeds obtained from narcotics distribution, in violation of 18 U.S.C. § § 841 and 846, as such offenses relate to money laundering transactions utilizing the proceeds of a specified activity, namely marijuana trafficking." [Doc. 97-3 and Ex. A]. The affidavit states that, based on his personal participation in the investigation, SA Groves has "probable cause to believe that

---

[1]The affidavit in support of the search warrants cited herein are attached as an exhibit to Defendant Ramirez's motion [Doc. 97-2]. The Court notes that the affidavit sets forth the same information and factual basis, with the only difference being the addresses of the premises to be searched.

evidence pertaining to Ramirez's ... laundering of proceeds obtained from narcotics distribution, in violation of 18 U.S.C. § § 1956 & 1957, and/or the distribution of an conspiracy to distribute controlled substances in violation of 21 U.S.C. § § 841 and 846, will be found at the premises listed above." [Doc. 97-3 and Ex. A]. The basis of the affiant's belief is set forth as follows: First, the affiant states that based on his training and experience involving narcotics investigations and financial and money laundering investigations, he knows that drug traffickers: (1) acquire and maintain records related to drug distribution and records relating to the acquisition and disposition of drug proceeds; (2) commonly profit and amass proceeds from the sale of drugs and attempt to disguise and legitimize these profits through money laundering activities; (3) purchase and/or title assets bought with drug proceeds in fictitious names, aliases, names of relatives, associates, or business entities, who serve as "nominee" title holders while the drug traffickers actually own and continue to use the assets and exercise dominion and control over the assets; (4) engage in legitimate businesses as a "front" to launder drug proceeds; (5) maintain records pertaining to their acquisition, conversion, movement, secreting, transfer, concealment, and/or expenditure of drug proceeds[2]; (6) are known to use aliases, fictitious and multiple addresses, and multiple driver's licenses and maintain records of the same in order to conceal their true identity and hinder law enforcement investigation of their illegal activity; (7) often obtain lines of credit, loans, or mortgages to purchase assets in which they have low equity interest to avoid seizure and forfeiture; (8) primarily utilize U.S. currency as the method of conducting their illegal activity and often maintain and have quick access to large amounts of U.S. currency or other liquid assets; (9) create/maintain books, records, receipts, notes, ledgers

[2]Proceeds include currency, financial instruments and investments, real estate, automobiles, boats, other vehicles, home furnishings, stocks, bonds, precious metals and gemstones, jewelry, electronic equipment and other assets in the form of books, records, invoices, receipts, records of real estate transactions, purchase agreements, automobile titles, bank statements, financial statements, letters of credit, money orders, cashier's checks, safe deposit box agreements and keys, and money wrappers

reflecting the names, nicknames, addresses, contact numbers of their drug trafficking conspirators and drug customers; (10) use telephones to facilitate their drug activities and keep records of such calls; (11) take photographs or video movies of themselves, their associates, their property and assets, and their product; (12) maintain firearms in order to protect and secure their property; and (13) and will maintain the above listed documents for long periods and are often maintained in the residence, garage, other outbuildings, and curtilage.

Second, the affiant proceeds to set forth the facts and circumstances which SA Groves believes are sufficient to conclude that the items, as described above and more specifically set forth in [Doc. 97-3 and Ex. A] will be found at the locations listed. On January 7, 2006, law enforcement officers in Arizona arrested a cooperating source (CS-1) for money laundering and interstate commerce with the intent to distribute proceeds of an unlawful activity after it was pulled over with approximately $360,000 in cash. CS-1 identified James Michael West ("West") as the owner of the cash and that the cash was proceeds of West's marijuana distribution network. CS-1 further identified Phillip A. Apodaca ("Apodaca") as the source of West's marijuana and the individual to whom he was delivering the cash for payment of the marijuana. On July 11, 2006, West and Apodaca were indicted in the Eastern District of Tennessee for conspiracy to commit money laundering in violation is 18 U.S.C. § 1956h, and the distribution of and conspiracy to distribute controlled substances, in violation of 21 U.S.C. § § 841 and 846. In July, 2006, West was arrested and began cooperating with law enforcement. West confirmed to law enforcement that Apodaca was the source of his marijuana and that over several years, he had obtained over 10,000 pounds of marijuana from Apodaca in Tucson, Arizona and distributed it throughout East Tennessee. West further advised law enforcement that he met Apodaca's Mexican source of marijuana once during a visit to Tucson, Arizona and identified the

4

photograph of Defendant Ramirez as the source. West stated the purpose of the visit was to assure Ramirez that he and Apodaca would make up for the losses of cash and marijuana which resulted from a seizure by law enforcement during transit. West further advised this was the only time he had met Ramirez.

On July 18, 2006, Apodaca was arrested at his residence in Tucson, Arizona during the execution of a search warrant. Apodaca advised SA Groves that Defendant Ramirez was present during the execution of the search and arrest warrant at his residence. In November, 2006, Apodaca began cooperating with law enforcement officials. Apodaca identified his source for marijuana as Defendant Ramirez and advised law enforcement that Ramirez resided at 5531 W. Fireopal Way, Tucson, Arizona.[3] Apodaca further stated that Defendant Ramirez was his only source of marijuana and he had dealt with him in multiple 100-pound quantities since 2000. Apodaca also identified photos of Defendant Ramirez taken on the day of his arrest and stated Ramirez has no legitimate source of income and that he supports himself through drug trafficking. Apodaca also positively identified a photograph of Ramirez obtained from Immigration and Customs Enforcement. Apodaca stated that Defendant Ramirez is married to a woman named Michelle Chavez and identified a photograph of Ms. Chavez.[4] Apodaca also advised he would go to Defendant Ramirez's Fireopal residence frequently since it was only a few blocks from his own residence, and that he and Defendant Ramirez frequently count the cash obtained from marijuana sales at this residence and recalled Defendant Ramirez maintaining a money counter at the residence to assist in the counting.

---

[3]According to SA Groves's affidavit, the information regarding Defendant Ramirez's residence was corroborated through public records and additional third party contacts.
[4]The affiant further states that he obtained an Affidavit for Marriage License from the Pima County, Arizona, Clerk's Office for Defendant Ramirez and Ms. Chavez. The address listed in the affidavit is 5531 W. Fireopal Way, Tucson, Arizona.

Additionally, Apodaca stated that Defendant Ramirez told him, on many occasions, that he did not maintain assets in his own name, but that he places assets in the names of others in order to conceal the true owner of the assets. Apodaca further stated that Defendant Ramirez told him the Fireopal residence was not in his name, but that it belonged to him. A Warranty Deed filed in Pima County, Arizona, reflects that on June 15, 2005, the residence located at 5331 W. Fireopal Way, Tucson, Arizona was purchased by a single woman named Claudia Campbell. On October 11, 2006, a Beneficiary Deed was filed naming Michelle Chavez the grantee beneficiary of 5331 W. Fireopal Way, Tucson, Arizona. In additional to the Fireopal residence, Apodaca identified 4872 W. Placita De Los Vientos, Tucson, Arizona as another home owned by Defendant Ramirez. Defendant Ramirez told Apodaca in the summer of 2006 he was planning to purchase this residence, but put the residence in the name of "Josie", a female Mexican national who resides in Naco, Mexico. A Warranty Deed filed in Pima County, Arizona, reflects that on June 26, 2006, the residence located at 4872 W. Placita De Los Vientos, Tucson, Arizona was purchased by a single woman named Josefina Alvarez Valenzula, and upon the death of Ms. Valenzula, Martina Reyna Garcia was named as the grantee beneficiary. Apodaca further stated Defendant Ramirez had invited Apodaca's wife and children to the Placita De Los Vientos residence to use the swimming pool. Apodaca told law enforcement that Defendant Ramirez allows his sister-in-law and father-in-law to reside at the Placita De Los Vientos residence.

Apodaca also identified Luke McLaughlin ("McLaughlin") as an individual involved in the drug and money laundering conspiracy. Apodaca states that McLaughlin would perform several duties to further the overall conspiracy, including making visits to customers relating to quality of the marijuana, driving cash to Arizona, and obtaining the leases for stash houses.

Apodaca stated that on or about April 12, 2007, his wife, Maria, visited McLaughlin at his residence in Tucson, Arizona to solicit cash for living expenses. During this meeting, McLaughlin informed Maria that he and Defendant Ramirez were "still working together."

The magistrate judge issued the search warrants for the five residences, including the residences located at 5331 W. Fireopal Way and 4872 W. Placita De Los Vientos, Tucson, Arizona, and its curtilage and outbuildings, appurtenances, and attached and detached garages and vehicles and trailers located on such curtilage surrounding the residence on May 11, 2007. Both search warrants were executed on or about May 16, 2007.

## II.    Findings of Fact

The Court notes that in light of no witness testimony, the facts are not in dispute. In addition, the Court makes its factual findings in the analysis section of the memorandum.

## III.    Analysis

As a threshold matter, the Court must determine whether Defendant Ramirez had a privacy interest in the Placita De Los Vientos residence. The government raises the issue of standing in its brief in response to Defendant's challenge of the search at the Placita De Los Vientos residence.

Defendant Ramirez contends that evidence seized from the Fireopal residence and the Placita De Los Vientos residence pursuant to federal search warrants executed on or about May 16, 2007 should be suppressed because the affidavit supporting the search warrants failed to establish probable cause for a number of reasons. First, Defendant Ramirez asserts that the search warrant lacks a nexus between the places to be searched and the items to be seized. Second, Defendant Ramirez contends the affidavit lacks sufficient allegations and corroboration. Third, Defendant Ramirez argues the affidavit is based on stale information. Lastly, Defendant

Ramirez argues the warrants were issued on a bare bones affidavit, thus the good faith exception set forth in United States v. Leon, 468 U.S. 897 (1984) is inapplicable. The government counters Defendant's argument on each point as indicated in detail below. The Court will examine each of Defendant's contentions in turn.

### A. Standing

The Fourth Amendment does not guarantee against all searches and seizures; it only guarantees against unreasonable searches and seizures. United States v. Sharp, 470 U.S. 675, 682 (1985). Additionally, Fourth Amendment rights are personal rights which cannot be vicariously asserted. Minnesota v. Carter, 525 U.S. 83, 88 (1998). Because the Fourth Amendment guarantees only against unreasonable searches and seizures and these rights are personal, the defendant bears the burden of proving that his own Fourth Amendment rights were violated and that he has "standing" to assert a Fourth Amendment violation. United States v. Salvucci, 448 U.S. 83, 86 (1980).

The government argues that Defendant Ramirez does not have standing to challenge the search of the Placita De Los Vientos residence because Apodaca advised the affiant that while Defendant Ramirez claimed to be the actual owner of the Placita De Los Vientos residence, he allowed his sister-in-law and father-in-law to live there. Thus, the government claims Defendant Ramirez does not have a legitimate expectation of privacy in the Placita De Los Vientos residence. Defendant Ramirez does not claim that he lived at the Placita De Los Vientos residence, but claims that since the government characterized the property as his "second" residence in the affidavit supporting the search warrant, he has a reasonable expectation of privacy in the premises searched [Doc. 97-2]. Defendant Ramirez's pleading relies on the

government's own assertion within the four corners of the affidavit that the Placita De Los Vientos is his second residence, which the government now seems to seek to repudiate.

In reviewing the validity of a search warrant, the Court is generally "concerned only with the statements of fact" "contained within the four corners of the underlying affidavit." United States v. Hatcher, 473 F.2d 321, 323 (6th Cir. 1973); United States v. Shields, 978 F.2d 943, 946 (6th Cir. 1992). The government now seems to urge the Court to lift the veil and look behind the affidavit to the surrounding facts to deny Defendant Ramirez standing to challenge the search of the Placita De Los Vientos residence. The government previously classified the Placita De Los Vientos residence as Ramirez's second residence and utilized this reference in support of its efforts to obtain the search warrant in question, and must adhere to the prior classification. Accordingly, this Court finds that under a four corners analysis, Defendant Ramirez has standing to challenge the search at the Placita De Los Vientos residence based on his ownership of the property, his apparent control of the property, (in determining whose name it would be placed in, who would reside there, and inviting people like Apodaca over to visit) as well as the government's previous representation to the Defendant and the District Court of Arizona that the Placita De Los Vientos residence was the "second residence of RAMIREZ in which his sister-in-law and father-in-law reside." [Ex. A, Doc. 97-3]. The Court must note its uneasiness with the government's attempt to use the relationship of Ramirez to this property as both a shield and a sword and its attempt to advance inconsistent positions regarding the facts supporting the underlying affidavit. That is, the government argues that Ramirez's contact with the property is sufficient to establish probable cause to believe that evidence of criminal activity will be found on the premises, but it contemporaneously argues that his contacts with this property are so lacking as to even permit standing.

9

**B.      Whether the Affidavit Fails to Establish Probable Cause for Issuance of a Search Warrant**

The Fourth Amendment requires probable cause for searches and seizures.  U.S. Const. amend. IV.  When reviewing an application for a search warrant, the magistrate is charged with the responsibility of making an independent determination of whether probable cause existed based on the "totality of the circumstances."  United States v. Pardue, 895 F.2d 1415, 1990 WL 9973, *2 (citing Illinois v. Gates, 462 U.S. 213 (1983)).  The Sixth Circuit has defined probable cause as "reasonable grounds for belief supported by less than *prima facie* proof but more than mere suspicion," United States v. Padro, 52 F.3d 120, 122-23 (6th Cir. 1995), and as a "practical, non-technical conception that deals with the factual and practical considerations of everyday life."  United States v. Frazier, 423 F.3d 526, 531 (6th Cir. 2005).  "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search."  United States v. Abboud, 438 F.3d 554, 569 (6th Cir. 2006) (citing, Frazier, 423 F.3d at 537).

The standard of review for this Court is whether, granting great deference to the decision of the issuing magistrate judge, the evidence contained in the affidavit viewed as a whole provided a substantial basis for the issuing magistrate judge's finding of probable cause.  Massachusetts v. Upton, 466 U.S. 727, 732 (1984); United States v. Greene, 250 F.3d 471, 478 (6th Cir. 2001); United States v. Davidson, 936 F.2d 856, 859 (6th Cir. 1991).  The "task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant."  Upton, 466 U.S. at 2085.

## 1.      *Nexus with the Location Searched*

First, the Court acknowledges Defendant Ramirez is challenging two separate searches: the search of Fireopal residence and the search of the Placita De Los Vientos residence.  Citing United States v. Carpenter, 360 F.3d 591, 594 (6th Cir. 2004), Defendant Ramirez [Doc. 97-2] contends that there was a lack of nexus between the criminal activity alleged in the affidavit and the places to be searched.  The government responds [Doc. 142] that Defendant's allegations disregard that the affiant corroborated the information provided by the named informants as to the Fireopal and Placita De Los Vientos residences.

"To justify a search, the circumstances must indicate why evidence of illegal activity will be found in a particular place.  There must, in other words, be a nexus between the place to be searched and the evidence sought."  United States v. Washington, 380 F.3d 236 (6th Cir. 2004) (citing, Illinois v. Gates, 462 U.S. 213, 238-39 (1983)).  Thus, the critical question for the Court in the present case is whether the facts alleged in the affidavit established a sufficient nexus between the Defendant and the addresses given or between the defendant and any criminal activity that occurred at the listed residences.  The Court will address each residence and Defendant's probable cause challenge separately.

### a.      Fireopal Residence

The Court finds that Defendant Ramirez's argument that there was no nexus between the location searched, the Fireopal residence, his primary residence, and the evidence sought is without merit.  First, the affidavit supports the finding that the Defendant possessed, occupied and resided at this particular residence described in the search warrant. Second, there is evidence in the record to support the government's allegations that the defendant engaged in ongoing criminal activity between 2006 and 2007 at the Fireopal residence, including evidence that

11

Ramirez was Apodaca's sole source of marijuana and he regularly frequented the residence that Ramirez and Apodaca would "frequently count the cash obtained from marijuana sales at this residence" and maintained a money counter there. [Doc. 97-3]. Third, the Court relies on Sixth Circuit authority in finding that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live." Jones, 159 F.3d at 975. The Court additionally relies on the professional opinion of SA Grove that drug traffickers keep and maintain records of their drug-related activities and assets purchased with drug proceeds at their residences. See Abboud, 438 F.3d at 572 ("the magistrate correctly relied on the affiant's experience in his assessment of the probable location of the evidence"). Thus, the Court finds that the facts alleged in the affidavit establish a sufficient nexus between the criminal activity (marijuana trafficking and money laundering) and Defendant Ramirez's Fireopal residence.

### b.       Placita De Los Vientos Residence

As previously stated above, the Court finds Defendant Ramirez's standing to challenge the search of the Placita De Los Vientos residence has been established. Defendant Ramirez contends that the only corroboration in the affidavit as to the Placita De Los Vientos residence is inconsequential to support a finding of probable cause. Defendant argues that Apodaca knowing the first name of the record owner of the Placita De Los Vientos residence and that Ramirez allegedly made a down payment in cash is not corroborative of matters relating to probable cause to believe evidence of criminal activity will be located therein. [Doc. 97-2].

In this case, every instance of illegal activity referenced in the affidavit took place at Defendant's Fireopal residence. The only information provided about the Placita De Los Vientos residence is that Ramirez was planning to purchase it for $400,000 and place the residence in the name of "Josie", a female Mexican national, the Warranty Deed reflects that the

Placita De Los Vientos residence was purchased by a single woman named Josefina Alvarez Valenzuela, and that it was Ramirez who allowed Ramirez's sister-in-law and father-in-law reside there and that Ramirez had invited Apodaca's family to the residence [Doc. 97-3].

The government would have the Court conclude, based upon the apparent fact that somehow Defendant Ramirez somehow utilized the Placita De Los Vientos residence, and SA Grove's experience that drug traffickers often purchase and/or title assets bought with drug proceeds in names of relatives and have quick access to large amounts of U.S. currency, that there was a sufficient nexus between the Placita De Los Vientos residence and the drug trafficking activity at the Fireopal residence. With due regard for SA Grove's experience, an officer's training and experience alone are no substitute for the required evidentiary nexus between criminal activity and the place to be searched. United States v. Schultz, 14 F.3d 1093, 1097 (6th Cir. 1994). Although the Court has no difficulty accepting that drug traffickers keep and maintain records of their drug-related activities and assets purchased with drug proceeds at their residences, that truism is of little benefit when faced with multiple addresses. The only connection between Defendant Ramirez's criminal activity at his Fireopal residence and the Placita De Los Vientos residence is the natural suspicion that one accused of criminal activity may maintain evidence of their crimes anywhere they spend time, a suspicion that has been held insufficient by the Sixth Circuit. See Schultz, 14 F.3d at 1097-98.

The Court is not suggesting that multiple residences will always be immune to search. But for information about a criminal venture in one residence to justify a search of another residence, there must be some additional reason to suggest that evidence is likely to found at each. At the very least, probable cause requires that there be something about the second residence to indicate that it is also involved in criminal operations known to be on-going

elsewhere. There simply must be, but herein is not, probable cause shown to believe that there is a fair probability that contraband or evidence of a crime will be found in that particular place. Illinois v. Gates, 462 U.S. 213, 238 (1983); see also United States v. Carpenter, 360 F.3d 591, 594-95 (6th Cir. 2004) (holding that the probable cause requirement means that there is probable cause to believe that certain tangible items or things will be found at the location to be searched; it is not sufficient to merely allege the owner of the location to be searched is suspected of a crime). In contrast, the affidavit in the present case does not establish through any allegations that any illegal activity had occurred at or was occurring at or that any evidence of such would be found at the Placita De Los Vientos residence. Consequently, the Court must conclude that the warrant to search the Placita De Los Vientos residence was issued without probable cause.

### 2. *Insufficient Allegations and Corroboration*

Because the Court finds that the search warrant to the Placita De Los Vientos residence was without probable cause, this argument and subsequent arguments will be addressed only with regard to the Fireopal residence. Defendant Ramirez argues [Doc. 97-2] that SA Grove's affidavit in support of the search warrant lacks sufficient allegations necessary to establish probable cause because the information provided by Apodaca was uncorroborated and lacked independent investigation. The government responds [Doc. 142] that the affidavit, which specifically names two individuals who will provide information, establishes Defendant Ramirez's criminal activity in regard to the two residences and that the affidavit is to be reviewed in the totality of the circumstances determination rather than a line-by-line scrutiny.

The Court finds Defendant's argument is misplaced. Probable cause may be established through information from any reliable source or sources. Draper v. United States, 358 U.S. 307, 313 (1959). An affidavit based on information from a confidential source provides a substantial

14

basis for a finding of probable cause based on a totality of the circumstances approach.  See United States v. Allen, 211 F.3d 970, 972-73 (6th Cir. 2000) (en banc).  As such, the veracity, reliability, and basis of knowledge of an informant are all relevant to the totality of the circumstances test, but the Court notes that they are not rigid categories.  Allen, 211 F.3d at 972-73.  As the Sixth Circuit recently explained:

> [W]hile an affidavit must state facts supporting an independent judicial determination that the informant is reliable, those facts need not take any particular form.  The affidavit could state police corroborated significant parts of the informant's story.  Or the affiant could attest "with some detail" that the informant provided reliable information in the past.  Or there could be other indicia of the informant's reliability, such a detailed description of the what the informant observed firsthand, or the willingness of the informant to reveal his or her name.  As long as the issuing judge can conclude independently that the informant is reliable, an affidavit based on the informant's tip will support a finding of probable cause.

United States v. McCraven, 401 F.3d 693, 697 (6th Cir. 2005).

Based on the totality of the circumstances, the Court agrees with the government that the affidavit submitted in support of the search warrant [Doc. 97-3] does state facts that would support an independent judicial determination that the informants, West and Apodaca, are reliable.  Specifically, the Court finds sufficient indicia of the informants' reliability based on (1) West's and Apodaca's willingness to disclose their names, (2) that Defendant Ramirez was present when Apodaca was arrested in July, 2006, (3) that Apodaca had been to the Fireopal residence on numerous occasions, the purpose of which was to count the cash obtained from the sales of marijuana, and (4) and that Defendant Ramirez kept a money counter at the Fireopal residence to assist in counting the cash proceeds from the marijuana sales.  Additionally, the affidavit sets forth facts indicating that SA Grove corroborated Apodaca's allegations, to the extent that he verified the Defendant's residential address, marital status, utility records.  SA

Groves confirmed that Defendant Ramirez and a woman by the name of Michelle O. Chavez are married, that Defendant and Ms. Chavez's marriage license lists the address of the Fireopal residence as their residence, and that the Tucson Electric Power Company listed Ms. Chavez on its accounts for the Fireopal residence.

In making the above findings, the Court notes that it was unpersuaded by Defendant's argument that in order for the affidavit in this case to be sufficient it must state that SA Grove independently corroborated the information provided by the informants. The determination of probable cause does not lend itself to the application of "[r]igid legal rules," and no one decision may serve to provide a definitive basis upon which to rely inasmuch as "informant's tips, like all other clues and evidence...may vary greatly in their value and reliability." United States v. Negro, 181 F.3d 105, 1999 WL 357778 at *4 (6th Cir. May 20, 1999). In other words, while an affidavit must state facts supporting an independent judicial determination that the informant is reliable, "those facts need not take any particular form." McCraven, 401 F.3d at 697. "The affidavit could state that the police corroborated significant parts of the informant's story....Or there could be other indicia of the informant's reliability, such as...the willingness of the informant to reveal his or her name." Id. Independent corroboration of an informant's story is not necessary to a determination of probable cause, as long as the issuing magistrate judge can conclude independently that the informant is reliable. Id.; see also United States v. Pellham, 801 F.2d 875, 878 (6th Cir. 1986). Additionally, the information given by Apodaca and West would be statements against their own interest, thus, adding to their credibility and reliability.

Accordingly, the Court finds that the affidavit in this case contains sufficient indicia of the informants' reliability and sufficient particularized facts and factual circumstances to support the informants' knowledge. Additionally, the affidavit is supported by independent investigative

actions on the part of SA Groves to corroborate the informants' allegations, to the extent that SA Groves corroborated verified Defendant's residential address and marital status. Thus, affording proper deference to the finding of probable cause, this Court finds that the Magistrate Judge, given all the circumstances set forth in the affidavit [Doc. 97-3], had a substantial basis for concluding that a search of Defendant's Fireopal residence would uncover evidence of wrongdoing.

### 3. *Staleness*

Defendant Ramirez contends [Doc. 97-2] that the search warrants, issued on May 11, 2007 were based on stale information because the last allegation of drug activity at the Fireopal residence was prior to Apodaca's arrest in July 2006, at least nine months prior to the issuance of the search warrant. See United States v. Abboud, 438 F.3d 554, 572 (6th Cir. 2006). The government responds [Doc. 142] that the question of staleness with respect to the information supporting probable cause depends not on an arbitrary time line, but rather on the nature of the crime, the criminal, the place to be searched, and the thing to be seized. United States v. Spikes, 158 F.3d 913, 923-24 (6th Cir. 1998).

Initially, the Court notes that the standard of review for a staleness determination is the same as the standard for determining the sufficiency of an affidavit. United States v. Greene, 250 F.3d 471, 480 (6th Cir. 2001). (citing United States v. Canan, 48 F.3d 954, 958-59 (6th Cir. 1995). In sum, a magistrate judge must determine whether, under the totality of the circumstances, probable cause exists to issue the warrant. Id. at 958. This Court will only reverse a magistrate's decision to grant a warrant if it was arbitrarily exercised. Id. (citing United States v. Spikes, 158 F.3d 913, 923 (6th Cir. 1998).

The probable cause required for a search warrant "is concerned with facts relating to a presently existing condition." United States v. Abboud, 438 F.3d 554, 572 (6th Cir. 2006) (citing Spikes, 158 F.3d at 923). "Thus the critical question is whether the information contained in the affidavit, when presented to the...judge, established that there was a fair probability that [evidence] would still be found at [the location of the search])." Id. In other words, a warrant is stale if the probable cause, while sufficient at some point in the past, is now insufficient as to evidence at a specific location. Id.

The staleness inquiry is tailored to the specific circumstances in each case. Id. (citing, Sgro v. United States, 287 U.S. 206, 210-11 (1932)). "[T]he length of time between the events listed in the affidavit and the application of the warrant, while clearly salient, is not controlling." Id. It is possible then even if a substantial amount of time has elapsed between "a defendant's last reported criminal activity" and the issuance of the warrant, the warrant has not become stale. Id. The Sixth Circuit has outlined several factors to consider when analyzing staleness: (1) the inherent nature or character of the crime; (2) whether the criminal is nomadic or entrenched; (3) whether the items to be seized are perishable and easily transferable or of enduring utility; and (4) whether the place to be searched is a mere criminal forum of convenience or a secure operational base for criminal conduct. Id. The length of time between the events listed in the affidavit and the application for the warrant, "while clearly salient, is not controlling." Id. Where the evidence reveals that the criminal activity is "of a continuing nature", the passage of time does not necessarily present a staleness problem. Spikes, 158 F.3d at 924. In fact, evidence of an ongoing criminal activity, "will generally defeat a claim of staleness." United States v. Greene, 250 F.3d 471, 481 (6th Cir. 2001). As the Spikes variables are determinative, this Court will address them, in turn, as they apply to the facts in Defendant Ramirez's case.

### 1. *The Character of the Crime*

First, the Court considers the inherent nature or character of the crime, whether this crime was more akin to a "chance encounter in the night or regenerating conspiracy." Spikes, 158 F.3d at 924. The Sixth Circuit has found that "[e]vidence of ongoing criminal activity will generally defeat a claim of staleness." Greene, 250 F.3d at 481. The Court has also found that ongoing criminal activity *at a given time* may likewise be sufficient to defeat a claim of staleness. Abboud, 438 F.3d at 573. (citing Greene, 250 F.3d at 481); see also Canan, 48 F.3d at 959 (finding ongoing activity at the defendant's house four years prior to the issuance of the search warrant was sufficient to defeat a claim of staleness). "[I]f an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." Canan, 48 F.3d at 959. Moreover, although a significant period of time may have elapsed since a defendant's last reported criminal activity, it may be properly inferred that indicia of criminal activity, such as records of criminal activity, will be kept for some period of time." Id. (citing United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991); United States v. Craig, 861 F.2d 818, 822 (5th Cir. 1988)).

In the present case, Defendant Ramirez argues that the affidavit in support of the warrants to search the Fireopal residence, issued in May 2007, was based upon "stale" data, in that the affidavit does not describe any conduct connected with criminal activity occurring at the residence after Apodaca's arrest in July 2006 [Doc. 97-2]. While the Court agrees that the affidavit does not allege any criminal conduct occurring after 2006, it nonetheless finds that the affidavits provide substantial evidence of Defendant Ramirez's ongoing criminal activity up to the time of Apodaca's arrest in July, 2006. Specifically, the affidavit states that Defendant Ramirez engaged in marijuana trafficking with West and Apodaca up until the time if their

19

arrests in July, 2006, during which times thousands of pounds of marijuana were delivered from Tucson, Arizona to East Tennessee. Furthermore, the affidavit states co-conspirator McLaughlin had a conversation with Apodaca's wife, Maria, on April 12, 2007 in Tucson, Arizona. According to the affidavit, Maria visited McLaughlin to solicit cash for living expenses and during this visit, McLaughlin advised Maria that he and Defendant Ramirez were "still working together" [Doc. 97-2]. Thus, even though the affidavit does not establish a continuous criminal enterprise to the issuance of the search warrant in May 2007, the aforementioned Sixth Circuit jurisprudence suggests that ongoing criminal activity at any time may be sufficient to defeat a claim of staleness.

### 2. *The Characteristics of the Criminal*

Next, the Court considers the characteristics of the criminal: was Defendant Ramirez appropriately characterized as nomadic or entrenched? The Court finds that it can reasonably be inferred from the affidavit that Defendant Ramirez was not nomadic inasmuch as the affidavit indicate that Defendant Ramirez possessed, occupied and/or resided at the Fireopal premises described in the search warrants, at least since 2005. This information is corroborated Apodaca, who went to the Fireopal residence described in the search warrant to count the cash obtained from marijuana sales, as well as by utility records which confirmed that the Defendant had utilities in his wife's name at this address. There being no evidence to indicate that the Defendant Ramirez moved from place to place, so as to decrease the probability of finding evidence at this location, the Court finds that the affidavit support the fact that Defendant Ramirez was not nomadic, but instead was entrenched.

### 3.    *The Item to be Seized*

The third <u>Spikes</u> factor considers the nature of the item(s) to which the search is directed. This factor considers whether the items to be seized are perishable and easily transferable or of enduring utility to the holder.   The Court notes that the search warrants in the instant case authorized the seizure of items including both controlled substances, assets, and items that were documentary in nature [Doc. 97-2, Ex. B].

As established above, this case involves the crimes of drug trafficking and money laundering.   Both of these crimes are considered to be ongoing criminal activity in the Sixth Circuit.   <u>See</u> <u>United States v. Bryant</u>, 145 Fed. Appx. 95, * 2 (6th Cir. May 13, 2005) (drug trafficking); <u>United States v. Abboud</u>, 438 F.3d 554, 561 (6th Cir. 2006) (money laundering). Although "a significant period of time may have elapsed since a defendant's last reported criminal activity, it may be properly inferred that indicia of criminal activity will be kept for some period of time."  <u>United States v. Canan</u>, 48 F.3d 954, 959 (6th Cir. 1995).   Thus, this Court finds it is likely the drugs would be at the Fireopal residence for an indefinite period of time.

Moreover, the Sixth Circuit has found that business records are a type of evidence that defy claims of staleness.   <u>See</u> <u>United States v. Abboud</u>, 438 F.3d 554, 573 (6th Cir. 2006); <u>United States v. Brownderville</u>, 187 F.3d 638, 1999 WL 618067 (6th Cir. Aug. 2, 1999); <u>United States v. Martinez</u>, 106 F.3d 402, 1997 WL 26461, *2 (6th Cir. Jan. 22, 1997); <u>United States v. Word</u>, 806 F.2d 658, 662 (6th Cir. 1986); <u>United States v. McManus</u>, 719 F.2d 1395, 1400-01 (6th Cir. 1983); <u>see also</u> <u>United States v. Singh</u>, 390 F.3d 168, 182 (2d Cir. 2004); <u>United States v. Farmer</u>, 370 F.3d 435, 439-40 (4th Cir. 2004); <u>United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents</u>, 307 F.3d 137, 148 (3d Cir. 2002).

In Martinez, the Court held that the search warrant was valid because it sought information regarding business and financial records, and such records are typically found in either a residence or place of business. Martinez, 1997 WL 26461 at *2. The Court found that it was reasonable for the magistrate judge to infer that evidence of drug trafficking and money laundering would be found in Martinez's apartment and place of business because two sources had indicated that the defendant used his business as a money laundering operation for his drug profits. Id. Furthermore, there was evidence from several sources that the defendant engaged in illegal activities in his apartment. Id.

Similar to Martinez, the search warrants in this case sought evidence of drug trafficking and money laundering, predominantly in the form of business and financial records [Doc. 97-2 and Ex. A-B]. Additionally, the Court finds that the affidavit in this case, like Martinez, presents corroborating information that the Defendant engaged in marijuana trafficking at his residence. The Court also finds that the affidavits provide information regarding SA Grove's experience and training in investigating drug traffickers and his professional opinion that drug traffickers keep and maintain records of their drug-related activities at their residences, as well as assets purchased with drug proceeds. Accordingly, the Court finds that the magistrate judge was correct in believing that certain documents and assets regarding the defendants' drug trafficking and money laundering activities would be found at Defendant's residence. See Jones, 159 F.3d at 975 ("[i]n the case of drug dealers, evidence is likely to be found where the dealers live").

### 4.      *The Place to be Searched*

The final factor to consider is the location of the alleged criminal activity. The Court should consider whether the events took place in a mere criminal forum of convenience or a secure operational basis for criminal conduct. The affidavit at issue in this case requested the

search of Defendant's Fireopal residence. The Court finds, as stated in the affidavit, that the marijuana trafficking and money laundering alleged centered around the Defendant's illegal transactions conducted at the Fireopal residence. As noted above, the affiant opined that drug traffickers keep and maintain certain records of their drug-related activities and assets derived from the sale of drugs at their residences. Thus, the Court finds that Defendant's Fireopal residence was not a "mere criminal forum of convenience," but rather, was part of the core of the criminal charge or, in other words, was a "secure operational base" where ongoing criminal activity occurred.

Accordingly, the Court finds that all factors weigh against a claim of staleness. The Court is especially persuaded by the fact that business and financial records are typically found at either a residence or place of business, and that records of drug trafficking are no exception. Therefore, having found (1) that Defendant was engaged in ongoing criminal activity, (2) that he was entrenched, (3) that the search warrants sought controlled substances as well as records and assets regarding Defendant's drug trafficking and money laundering activities, and (4) the place to be searched was a secure operational bases, the Court finds that the warrants were not stale.

### E.    Good Faith Exception

Finally, the government argues that even if the affidavit is insufficient to provide probable cause, SA Grove acted in good faith in executing the search warrant, and the evidence should not be suppressed under United States v. Leon, 468 U.S. 897 (1984). Defendant Ramirez contends that the "good faith exception" established by Leon does not apply in this case because the affidavit did not provide the issuing judge with a substantial basis for finding probable cause. Again, the Court recognizes that Defendant Ramirez is challenging two separate searches: the search of Fireopal residence and the search of the Placita De Los Vientos residence. Since the

Court previously found that the affidavit provided a basis for finding probable cause to issue a search warrant as to the Fireopal residence, but not the Placita De Los Vientos residence, the Court will necessarily address a Leon analysis with regard to the Placita De Los Vientos residence and although this Court has previously found that the affidavit provided a basis for finding probable cause to issue a search warrant for the Fireopal residence, the Court will examine the applicability of the good faith exception in the event that the District Court disagrees that the affidavit establishes probable cause for the warrant's issuance.

### 1.    Fireopal Residence

In Leon, the Supreme Court recognized that the deterrent effect of the judicially created exclusionary rule did not extend to situations in which an officer in objective good faith obtains a search warrant from a judge and acts within the scope of that warrant. 468 U.S. at 920. "In the ordinary case, an officer cannot be expected to question the [judge's] probable-cause determination or his judgment that the form of a warrant is technically sufficient Penalizing the officer for the [judge's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Id. at 921. The fact that a judge has issued a warrant typically will establish that the officer has conducted the search pursuant to said warrant in good faith, but the officer's reliance upon the warrant must be objectively reasonable. Id. at 922. In other words, the good-faith inquiry turns upon "whether a reasonably well-trained officer would have known that the search was illegal despite the [judge's] authorization." Id. at 922 n. 23. In creating this standard, the Supreme Court set out four situations in which suppression pursuant to the exclusionary rule applied despite the officer's reliance upon a judicially-issued search warrant:

(1) if the ... judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth, (2) if the issuing judge "wholly abandoned his judicial role" requiring neutral detachment and, in essence, acted as " 'an adjunct law enforcement officer,' (3) if the "warrant [was] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,' and (4) if the warrant [is] so facially deficient-i.e., in failing to particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid.

Id. at 923 (quoting Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 326-27 (1979) and Brown v. Illinois, 422 U .S. 590, 610-11 (1975) respectively).

In the present case, the affiant did not present the issuing judge with a "bare bones" affidavit. The Sixth Circuit has defined a bare bones affidavit as a "conclusory affidavit," which gives only the affiant's belief of the existence of probable cause. United States v. Williams, 224 F.3d 530, 533 (6th Cir. 2000); see also United States v. Weaver, 99 F.3d 1372, 1378 (6th Cir.1996) (observing that a bare bones affidavit is one that "states suspicious beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge"). The affidavit in this case contains facts, not just the affiant's conclusions or beliefs. Additionally, the affiant conveyed statements from two named informants. Further, SA Grove states results of an extensive drug trafficking and money laundering investigation in the affidavit. Therefore, as the Supreme Court held in Leon, the Court finds that a reasonably well-trained officer would have relied upon the issuing judge's determination that the affidavit provides probable cause to search Defendant's Fireopal residence. Accordingly, this Court finds that SA Grove acted in good faith, and the good faith exception would apply in the event the affidavit is held to be incapable of supporting the probable cause required to issue a search warrant.

### 2. Placita De Los Vientos Residence

Having found that the affidavit at issue does not support a finding of probable cause to issue a search warrant as to the Placita De Los Vientos residence, the Court finds it necessary to determine whether the good faith exception to an invalid warrant, as articulated in <u>Leon</u>, applies in this case. Although the government argues the Court could, in the event it found the warrant to be "bare bones", sustain the warrant based on the <u>Leon</u> good faith analysis, it fails to articulate how.

In <u>United States v. Van Shutters</u>, 163 F.3d 331 (6th Cir. 1998), the Court applied the good faith exception to admit evidence seized from the search of a defendant's residence in Tennessee after the search of his cousin's house in Georgia, where he was temporarily staying, confirmed the defendant's long-term, on-going fraud and counterfeiting operation. The government conceded that there was no nexus to support the Tennessee warrant, but asserted, and the court agreed, that the warrant as executed in good faith. <u>Id.</u> at 337-38. The court found it was objectively reasonable for the Tennessee authorities to conclude that evidence of such an on-going criminal scheme conducted by the defendant would as likely be found in his home as in his cousin's home. <u>Id.</u>

One year later, the Sixth Circuit again applied the good faith exception to admit evidence seized from the search of a second dwelling in <u>United States v. Watkins</u>, 179 F.3d 489 (6th Cir. 1999). In that case, there was nothing in the affidavit to indicate that any illegal activity was taking place in the second house or on any party of the property other than the primary house in which the defendant lived, expect for the affiant's statement that "his training and experience led him to believe that evidence of such activity would likely be found in other structures on the property that were also under the control of [the suspect]." <u>Id.</u> at 499. The court found that this

nebulous connection was sufficient to satisfy the good faith exception, although not probable cause. It was significant in that case that the uninhabited dwelling was on the same property as the main house at which criminal activity had been observed. As Judge Boggs's concurrence in the court's 2-1 decision points out, "cases in this circuit and elsewhere clearly hold that a warrant for the search of a specified residence or premises authorizes the search of auxiliary and outbuildings within the curtilage," and under such circumstances a separate probable cause finding is not even required for the second dwelling. Id. at 505. Without this connection to the main residence, the facts in Watkins may well have resulted in suppression of the evidence.

In this case, SA Grove's information about Defendant Ramirez's continuing criminal activity related exclusively to the Fireopal residence. Although there was some connection between Defendant Ramirez and the Placita De Los Vientos residence, the suspicion that he might have contraband at that property was not buttressed by any other information known to the authorities: it was not on the same parcel of land as the Fireopal residence; there were no sightings of Defendant Ramirez transporting anything between the two properties; Apodaca provided no information regarding "ongoing criminal activity" at the Placita De Los Vientos residence; and there were no other indicia about the Placita De Los Vientos residence to connect criminal activity there.

In light of the Sixth Circuit's jurisprudence that searches of second or additional dwellings without specific evidentiary nexus are lacking in probable cause, the Court must conclude that for a federal law enforcement officer to believe otherwise under the circumstances presented here was unreasonable, unlike Van Shutters, the Placita De Los Vientos residence was not Defendant's primary residence, and unlike Watkins, the Placita De Los Vientos residence was not located on the same property. A reasonably prudent officer would have realized that

some additional investigation into the activities at the Placita De Los Vientos residence and some allegations of criminal activity related to it was necessary in order to connect it to Defendant Ramirez's apparent criminal behavior. Accordingly, the <u>Leon</u> good faith exception does not apply to these facts, and the evidence seized from the Placita De Los Vientos residence must be suppressed.

## IV.    CONCLUSION

For the reasons described more fully above, the Court respectfully **RECOMMENDS** that Defendant's Motion to Suppress [Doc. 97] be **GRANTED IN PART, DENIED IN PART**.  As to the search of the Fireopal residence, the Court recommends that Defendant's Motion to Suppress Evidence Seized be **DENIED**.  As to the search of the Placita De Los Vientos residence, the Court recommends that Defendant's Motion to Suppress Evidence Seized be **GRANTED**.[5]

Respectfully submitted,


     s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[5]  Any objections to this Report and Recommendation must be served and filed with the clerk of the court within ten (10) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P.  Failure to file objections within the time specified waives the right to appeal the District Court's order.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  The District Court need not provide <u>de novo</u> review where objections to this report and recommendation are frivolous, conclusive, or general.  <u>Mira v. Marshall</u>, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  <u>Smith v. Detroit Federation of Teachers</u>, 829 F.2d 1370, 1373 (6th Cir. 1987).